THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CLARENCE FAULKNER *et al.,* Defendants-Appellants.

(No. 56506;

First District—July 20, 1972.

*Rehearing denied September 14, 1972.*

Gerald W. Getty, Public Defender, of Chicago, (James J. Doherty, Assistant Public Defender, of counsel,) for appellants.

Edward V. Hanrahan, State's Attorney, of Chicago, (Robert A. Novelle and James E. Sternik, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE DEMPSEY delivered the opinion of the court:

Clarence Faulkner, Glen King, and James Davis were indicted for the murder of Joyce Webb, an 18-year-old girl. A jury found them guilty and they were sentenced to the penitentiary for 30 to 60 years.

The defendants contend that their conviction was based on unreliable testimony; that the trial court erred in admitting into evidence two photographs of the deceased and in not admitting a defense exhibit; and that they were prejudiced by the prosecutor's failure to correct false testimony and by his closing argument.

The almost nude body of Joyce Webb was found in a basement apartment at 1039 North Franklin Street, Chicago, on September 2, 1968. The corpse was facing upwards in a spread-eagle position; the face was bruised and blood had exuded from the orifices of the body. A patholo-

gist testified that the girl had been dead for two or three days and that the cause of death was asphyxiation from violent force applied to her neck.

About 10:00 P.M. on August 30, 1968, Patricia Banks saw the defendants assault Joyce Webb, drag her into an alley and then into a basement. Mary Dobbs also saw the abduction. She looked through a window in the living room of the basement apartment and observed the defendants alternate in holding and raping the victim. When they were finished King kicked her about the head. Seeing that they were about to leave, Dobbs ran to the front of the building where she met King as he came out. After the defendant had departed and a few minutes had elapsed, she entered the apartment and found Joyce Webb in the kitchen; she was dead. Later King told Dobbs, "One thing I want you to remember: If you tell, you will be next."

Neither Banks nor Dobbs reported to the police what they had seen. However, an excellent investigation by the police department uncovered both witnesses weeks after the crime and they testified against the defendants.

Mary Dobbs' credibility became a major issue at the trial. The State underscores the importance of her credibility in its brief, e.g., "[T]he State's case rested primarily on the credibility of Mary Dobbs * * *." and "[T]he defendants' entire case depended upon effective impeachment of Mary Dobbs * * *." The emphasis placed upon her credibility is further illustrated by the argument over the admissibility of the two pictures taken of the body of Joyce Webb which showed her legs spread wide apart and her body naked except for a dress pulled up to her shoulders. The defendants assert the pictures were inflammatory and of no probative value. The State replies that the pictures were essential to its case because they corroborated the testimony of Dobbs and enhanced her credibility.

Dobbs testified that she knew all the defendants and had spent most of the day of the murder drinking wine with them. The defendants presented substantial alibis as to their whereabouts the day and night of the crime. King attacked her motive for testifying. He said he first met her in late August 1968 and had sexual relations with her during the month of September. Early in October she told him she was pregnant; he disclaimed responsibility and refused to take care of the expected child. A week later he was arrested.

Dobbs testified that she knew King for six months before the date of the murder; King said they had known each other less than two weeks. The parties focused on this dispute. To show that her testimony was false and his correct, King forthrightly admitted that he had been convicted

of a prior criminal offense and had been confined at the Illinois State Farm at Vandalia from November 1967 until August 1968. He presented a certificate of discharge signed by the warden of the State Farm which stated that he entered the Farm on November 8, 1967, and was discharged on August 18, 1968. A full set of King's fingerprints appeared on the reverse side of the document. The exhibit was given to the prosecutor. At the conclusion of the defendants case it was offered in evidence. The prosecutor acknowledged that the exhibit purported to be an official document authenticated by the warden's signature but he objected to its reception in evidence on the grounds that it was cumulative to King's testimony, was hearsay and was not identified as a business record. The objection was sustained.

King had been tried in Cook County and imprisoned in an Illinois institution. If the prosecutor really doubted the authenticity of the exhibit he could have easily and quickly ascertained its genuineness. A telephone call would have revealed its accuracy or falsity. The experienced prosecutor must have realized that if the document was a forgery and King had lied, the readily available proof of this would have been devastating to the defendants. The prosecutor, however, had no reason to doubt that King was telling the truth. At the time he made his objection to the exhibit he had in his file King's criminal record. The record, which the prosecution presented at the aggravation and mitigation hearing, showed that King had been convicted of theft in October, 1967, and sentenced to the Vandalia State Farm for one year.

Dobbs' misstatement was of minor consequence when made and it might have remained so if the prosecutor had dealt with it is a straightforward manner. He could have candidly acknowledged that she was or might have been mistaken about the length of her acquaintanceship with King; he could have recalled her to the stand to correct or explain her statement. After all, the important thing was that she knew King at the time of the crime and thus was not mistaken in her identification. Instead, the prosecutor chose to stand by her statement and the issue grew in importance as the trial progressed. He concealed her error and flayed King's veracity. In his final argument he called King's testimony about being incarcerated at Vandalia proposterous and characterized it as a ruse and a hoax. He said:

"* * * all you have is Glen King's testimony that he was in jail * * *.

* * *

* * * if Glen King wanted to prove he was in Vandalia why didn't Glen King bring in the warden to say he was there. It's Glen King's defense, it is not the State's defense, Glen King created the issue and

he is the one trying to prove Mary Dobbs wasn't telling the truth. Why didn't he? He didn't."

It is incumbent upon a prosecutor to correct false testimony. Convictions were reversed in *Napue v. Illinois* (1959), 360 U.S. 264; *People v. McKinney* (1964), 31 Ill.2d 246, 201 N.E.2d 431; and *People v. Lueck* (1962), 24 Ill.2d 554, 182 N.E.2d 733, because the prosecutors did not correct the testimony of witnesses for the prosecution who said they received no promise of consideration or other inducement for their testimony when in fact they had. Fundamental fairness requires that a jury be fully and truthfully informed as to all matters within the knowledge of the prosecution bearing upon the credibility of a witness. (*People v. Martin* (1970), 46 Ill.2d 565, 264 N.E.2d 147.) While there is nothing in the record to indicate that the prosecutor knew that Dobbs' response was untrue when he asked her how long she had known King, King's testimony must have alerted him to this possibility. The information he had in his file of the punishment imposed on King in October of 1967 made the possibility a probability, and when King produced his discharge certificate the probability became a verifiable certainty.

The prosecutor ably represented the State. But his responsibility was not limited to the State. It was also his duty as the representative of the people to see that the defendants received a fair trial no matter how guilty they might have been. When he learned that his witness had made an untrue statement it was his obligation to inform the jury of this, not to mislead it by covering up her mistake, by interposing a barrier—even a technically correct one—to the full disclosure of the facts or by denouncing as preposterous opposing testimony he must have known was true. It was particularly unjust of him to chide the defendant for not producing the warden as a witness when his own action prevented the jury from seeing the warden's certification of King's discharge.

The conduct of the prosecutor in concealing the truth deprived King and his codefendants of a fair trial. There was no other error in the trial. The pictures were admissible to substantiate Mary Dobbs' testimony and the evidence was sufficient, if her testimony was believed, to sustain the convictions of all of the defendants. But we cannot speculate whether the jury would have accepted her full testimony if her credibility had been impaired by the revelation of her false statement. The jury should have been apprised of the falsity and allowed to weigh it in evaluating her reliability. The judgment is reversed and the cause remanded for a new trial.

Reversed and remanded.

McGLOON, P. J., and McNAMARA, J., concur.