THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* LEON BOLTON *et al.,* Defendants-Appellants.

(No. 71-182;

Third District—March 30, 1973.

*Rehearing denied May 1, 1973.*

John L. Barton, of Marseilles, for appellants.

Edward P. Drolet, State's Attorney, of Kankakee, for the People.

Mr. JUSTICE DIXON delivered the opinion of the court:

This was a prosecution in the Circuit Court of Kankakee County for murder against Leon Bolton, Charles Marshall and Tommy Watkins. After a jury verdict of guilty, the trial judge sentenced the defendants for a term of from 90 to 150 years. All three defendants have taken this appeal contending, first that the People knowingly used perjured testimony to obtain the convictions.

On Dec. 15, 1970, the victim disappeared from her home. During the next four days her relatives, neighbors and the local police searched the fields around her house for some sign of her. On the fifth day, Dec. 20, her body was found in one of the fields. She had been shot six times.

Within two weeks, the police had five suspects in custody. The first of the suspects was Philip Troupe. Based on statements of Troupe, the defendants, along with a Leo Collins, were arrested and indicted for

murder. (Collins also gave the State's Attorney a statement. In it he said that Bolton and Marshall had killed the victim and that no one else was present. The State gave notice that Collins' statement "may be exculpatory in nature with reference to said Tommy Watkins". Collins was granted a severance. He did not testify in the instant case, nor was the exculpatory statement presented to the jury in behalf of Watkins.)

Troupe was called as a prosecution witness. The jury was excused and the judge questioned Troupe, his attorney, and the prosecutor Fontenot about Troupe's willingness to testify. Both attorneys advised the judge that Troupe was testifying in return for the State's promise that he would not be prosecuted for murder. The following appears:

> "Mr. Fontenot: I might further show to the court that Philip Troupe was declared a delinquent on Feb. 10, 1971 under Case No. 70-J-4232 wherein he confessed to two counts[1] of the Petition and Count I of the petition as to murder was stricken as to him. As far as—
>
> The Court: When you say Count I as to murder—was that an agreement between you and defense?
>
> Mr. Fontenot: That was by representation that the State would handle all matters with reference to Troupe as a juvenile at which time he did consent—and which he did do—to testify before the Grand Jury in the Indictment of the present case on trial. * * *
>
> The Court: * * * And that if he does take the stand to testify, so far as the witness is concerned, whatever statements he may make which are incriminating so far as murder is concerned will not be by the State used to charge him with murder. Am I correct in that.
>
> Mr. Fontenot: That is correct, Your Honor."

The Court then addressed Philip Troupe:

> "Q. You are taking the stand because there has been an agreement between your lawyer and the State that the State will not prosecute you for murder?
>
> A. Yes."

The jury was thereafter brought in to hear Troupe's testimony. He testified that on the night of Dec. 15, he and the defendants went to the home of the victim where she was raped and later shot in a field nearby. On cross-examination the following appears:

---

[1] Troupe had committed aggravated battery and an armed robbery on Dec. 16, 1970 the day after the murder. At this time he was awaiting disposition on the charges.

"Q. Did anybody promise you anything to come in and testify in this case?

A. No.

Q. Are you charged with murder?

A. No.

Q. Did anyone talk to you about charging you with murder?

A. I don't remember.

Q. Are you telling this jury that as far as you can recall nobody promised you anything to come in here and testify?

A. Yes. I was told I might go to the Youth Commission. Nobody mentioned the Penitentiary or the electric chair.

Q. Mr. Troupe, did you for your part—Mr. Troupe, did you have more than one conversation with anybody from the State's Attorney's office concerning the Youth Commission and the punishment you might receive for your part in this?

A. No, not that I remember.

Q. So nobody has made you any promises?

A. No.

Q. But they have mentioned the Youth Commission to you?

A. Yes.

Q. Did anybody from the State's Attorney's Office—at any of the meetings you were at—ever tell you you were not going to be charged with murder?

A. I had two meetings with People from the State's Attorney's office. One was in the courthouse on the third floor in a little room. At one of those meetings Mr. Fontenot and Mr. Drolet were present and so was Mr. Lucas and Mr. Yurgine and yourself. My lawyer, Michael Berz was also present at the meeting. On another occasion I had a meeting with just the State's Attorney and myself being present. My lawyer was not at that meeting. I was not promised a deal to testify in this case.

Q. As a matter of fact, weren't you promised a deal to testify in this case.

A. No.

Q. You weren't?

A. No."

Then, when the time came for re-direct examination:

"The Court: You have anything else, Mr. Fontenot?

Mr. Fontenot: Yes, Judge—just a moment, please—no further questions."

On final argument by Mr. Fontenot the following appears: "Now, counsel for the defense may also tell you that Troupe—* * * they may

say he was promised something—but you remember Troupe's testimony. * * * Remember he was not promised anything."

The only evidence connecting the defendants with the murder was the testimony of Philip Troupe. The State had at least promised Troupe that if he testified against the defendants, the charges against him would be handled in the Juvenile Court. The prosecutor at trial knew of the agreement. The witness knew of the agreement, yet repeatedly denied that he had been promised anything for his testimony. Instead of disavowing the false testimony the prosecutor based his closing argument on it to compound the matter.

In the case of *Napue v. Illinois,* 360 U.S. 264, 3 L.Ed.2d 1217, the United States Supreme Court reversed a conviction for murder because an accomplice testified that he had been made no promises for his testimony against the defendant when in fact, he had been promised a sentence reduction and the trial prosecutor knew it. The Court said,

> "First it is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment. [Citing cases.] The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears. [Citing cases.]
>
> * * *
>
> The principle * * * does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend. * * * The district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth."

Recently, the court has followed *Napue's* holding in a case where the trial prosecutor did not know that a promise had been made (by another prosecutor on the staff). (*Giglio v. United States,* 31 L.Ed.2d 104.) The court stated, "* * * whether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor".

The People have cited *People v. Nash,* 36 Ill.2d 275; *cert. denied* 389 U.S. 906, 19 L.Ed.2d 223. There a co-defendant Triplett, testified for the State at defendant's murder trial, denied that promises of leniency had been made to him, when in fact the evidence was otherwise. *Triplett's lawyer later testified as to the true facts.* The Assistant State's Attorney assigned to the case *also testified* that he had discussed with Triplett's lawyer the recommendations which the People would make in

return for his testimony. The court stated, "There is a material difference in the *Napue* and *Lueck* cases and this case, however. In *Napue* and *Lueck* the prosecutor did nothing to correct the false testimony and the false testimony was unknown to the defendant at the time of the trial. Here the defendant knew of the false testimony and *evidence was presented to show that promises of leniency had in fact been made.* Under these circumstances there has not been a denial of due process of law".

In *Nash* the jury got the true story. In the instant case they did not.

In *People v. Lueck,* 24 Ill.2d 554, the Court held that failure of the prosecutor to correct the witness's testimony which he knew to be false denied defendant of due process.

The waiver theory was rejected by the majority in *Lueck.* The dissenting opinion states, "* * * the fact that false testimony was being given was known to the defense at the time of trial, and the means of combatting the false testimony were available at the trial."

Essentially the People's argument here is that the defense after cross-examination of Troupe and failing to elicit the truth, could have called the court reporter, the prosecutor and Troupe's lawyer (*People v. Werhollick,* 45 Ill.2d 459) and having failed to do so waived their right to claim denial of due process.

■■ We have previously noted that the prosecutor made no attempt to correct or explain the false testimony by re-direct examination. Instead, he chose to stand by the false testimony and compounded it in his final argument. The prosecutor ably represented the State. His responsibility was not limited to the State. It was also his duty to see that the defendants received a fair trial no matter how guilty they might have been. When he knew that Philip Troupe testified falsely it was his obligation to inform the jury of this, not to mislead further in final argument. (*People v. Faulkner,* 7 Ill.App.3d 221.) The witness who could have brought out the truth were as accessible to the State as to the defense and it is the general rule of criminal law that a defendant has no duty to call anyone as a witness in his case. (*People v. Munday,* 280 Ill. 32.) Fundamental fairness demands that State officials not only refrain from producing testimony known to be false but that they correct statements known to be false even if unsolicited.

■■ The People further argue that Troupe was not guilty of any crime and therefore was not an "accomplice" as in *Napue.* He was charged by the People in the Juvenile proceeding with murder, an instruction on accomplice testimony was given by the trial court, he was present from beginning to end and, in fact, even the next day was with the defendants when food stamps belonging to the victim were cashed at an A & P Store. Further, the rule of *Napue* is not limited to accomplice witnesses.

See *People v. Faulkner*, 7 Ill.App.3d 221; *People v. Martin*, 46 Ill.2d 565.

■■ The People argue that the testimony of Philip Troupe was initially given voluntarily and freely and was not induced by any subsequently discussed representation. This is a matter for jury determination.

■■ Lastly, the People argue that if any promise had in fact been made, that promise was fulfilled in the adjudication of Troupe as a delinquent on Feb. 10, 1971 and therefore bore no threat to the witness that would influence his testimony. For one thing, although he had been adjudicated a delinquent, he was still awaiting a dispositional hearing. And secondly, benefit conferred *i.e., whether he has received,* been promised, expects to obtain, or hopes for, leniency or immunity in consideration of his testimony are all matters which may be brought to the attention of the jury. *People v. Andrae*, 295 Ill. 445; *People v. Maggio*, 324 Ill. 516.

■■ Here the People's case depended entirely on Philip Troupe's testimony; without it there could have been no indictment and no evidence to carry the case to the jury. Troupe's credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to his prosecution would be relevant to his credibility and the jury was entitled to know it. A new trial is required if the false testimony could in any reasonable likelihood have affected the judgment of the jury. *Napue v. Illinois*, 3 L.Ed.2d on 1222.

■■ The defendants are also seeking outright reversal. They contend that inconsistencies in the testimony of Troupe largely concerned with the exact time of the offense and the exact location of the shooting in the fields near the victim's home along with his perjured testimony raise a reasonable doubt as to the truth of his testimony that defendants murdered the victim. We cannot agree. The argument is predicated on the question of credibility of Troupe. The resolution of testimonial conflicts is appropriately a matter for the trier of fact and only where the evidence is so unsatisfactory as to leave a reasonable doubt as to defendant's guilt will there be outright reversal. *People v. Hoffman*, 45 Ill.2d 221.

For these reasons a new trial is required and the judgment of conviction is reversed and the case is remanded.

Reversed and remanded.

ALLOY, P. J., and SCOTT, J., concur.